## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 08-CV-23401-CIV-COHN/SELTZER

SYDELLE RUDERMAN, by and through her
Attorney-in-fact, Bonnie Schwartz, and
SYLVIA POWERS, by and through her
Attorney-in-fact, Les Powers, and on behalf
of all others similarly situated,

         Plaintiffs,

   v.

WASHINGTON NATIONAL
INSURANCE COMPANY,
Successors in Interest to
Pioneer Life Insurance Company,

         Defendant.

_____/

### PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE [DE 65] TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [DE 58]

Plaintiffs, SYDELLE RUDERMAN, by and through her attorney-in-fact, Bonnie Schwartz, and SYLVIA POWERS, by and through her attorney-in-fact, Les Powers, ("Plaintiffs" collectively), hereby file their Reply to Defendant's Response [DE 65] to Plaintiffs' Motion for Class Certification [DE 58], and in support state:

### I.    PRELIMINARY STATEMENT

Defendant has forgotten the essence of this case. Liability of Defendant is not contingent on claims processing or what is medically necessary. On the contrary, the predominant question of this case is simple: it turns on whether or not an 8 % annual benefit increase called for under the standardized terms of Defendant's Limited Benefit Home Health Care Coverage Policy ("Policy") Policy only applies to the Daily Maximum benefit under the Policy, or whether it also applies to the Lifetime and Per Occurrence benefits under that Policy.  Despite what Defendant says, it's just that simple.

Instead of taking Plaintiffs to task on the application of the 8 % to the Policies of Class Members, Defendant has sought to divert this Court's attention away from what is germane.  To that end,

Defendant employs a host of stratagems: citations to cases from other jurisdictions, reliance on non-precedential trial court opinions, protestations about inconsequential Policy differences, *in terrorem* unmanageability contentions, and over-the-top hyperbole.[1] It also resorts to more base forms of attack: calling Plaintiffs or their counsel liars[2] or forgers.[3] These tactics violate the decorum of this Court--not to mention being flat-out wrong. This skewed approach holds true for Defendant's attempt to change the face of insurance law and parol evidence jurisprudence in Florida.

Defendant offers several theories about the purported myriad of individual proofs each elderly Class Member (or more likely their families or guardians) will have to submit to prove his or her damages. However, the predominance of common questions focuses on liability, not damages. Every damage-based class action will necessarily involve individual proofs of damage. The presence of such fact in this case is not the death knell to class certification, Defendant paints it to be. The reality is that proof of individual damages is not prohibitive here, especially given what appears to be the relatively modest size of the Rule 23(b)(3) Class (36-81 members), the ease with which their claims may be adjudicated based on Defendant's comprehensive claims apparatus and records, and various mechanisms this Court has employed to manage much larger damage class actions. For Rule 23(b)(2) Class Members, whose claims do not involve damages and which Defendant all but ignores, Defendant's critique of the predominance of common issues and the manageability of a damage class action is irrelevant.

The Rule 23(b)(2) and Rule 23(b)(3) Classes Plaintiffs propose should be certified without equivocation, and Defendant's objections should be overruled.

## II.      DEFENDANT CANNOT IGNORE FLORIDA LAW

Defendant cites numerous authorities from foreign jurisdictions, or from federal or state trial courts, to support its arguments about parol evidence and insurance policy interpretation *See, e.g.*, DE 65 at 16; 16 n 26; 17 n 27; 17 n 29; 18; 18 n 31; 19; 19 n 33; 20; 21; 21 n 35. This is misguided. If the Court were to follow these decisions, it would be changing the face of insurance law and the parol evidence rule in Florida.

Defendant cannot contend that Plaintiffs' substantive claims or insurance policy interpretations are somehow not governed by Florida law, or that the parol evidence rule as Florida courts apply and interpret it should not control. *See Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 328 F.

---

[1] Defendant states for example: "Trial in this case would be a *Franken*-trial, unmanageable at every level." DE 65 at 35 (emphasis in original).
[2] DE 65 at 13.
[3] *Id*. at 28.

Supp. 2d 1319, 1338 (S.D. Fla. 2004)(confirming federal courts construe the parole or "extrinsic" evidence rule as a rule of substantive law and the law of the state of the forum (Florida) is to be applied).   The role and authority of Florida substantive law in a diversity case (such as this) alleging state law claims is clear:

> …federal courts are bound to follow the decisions of the highest court of the state. If the highest state court has not addressed the issue, federal courts should ascertain and apply state law as pronounced by intermediate state appellate courts. Federal courts should view an intermediate state court's opinion as "indicia of the leanings of the state's highest court," and follow those "leanings," unless the federal court is convinced that the state supreme court would reach a different conclusion.

*Nussbaum v. Mortgage Serv. Am. Co.*, 913 F. Supp. 1548, 1554 (S.D. Fla. 1995)(internal citations omitted).  If the state Supreme Court has not spoken on an issue, a federal court must adhere to an intermediate court's decision on the issue, even if the federal court disagrees with the reasoning or outcome the adherence entails. *Nat'l Union Fire Ins. Co. v. Cavins*, 226 Fed. Appx. 895, 899 (11th Cir. 2007)(quoting and citing several published decisions).  Accordingly, when a Florida appellate court or the Florida Supreme Court has spoken on an issue for which Florida law supplies the rule, this Court is bound to follow it.  With respect to parol evidence and/or insurance policy interpretation, Defendant's citations to state trial court opinions or those of foreign jurisdictions on matters of substantive law cannot displace Florida law to defeat class certification or any other state law claim in this litigation.[4] Defendant's citations to such decisional law are unavailing.

### III.      PAROL EVIDENCE IS INADMISSIBLE IN THIS CASE

#### a.  *Contra Proferentem* is the Law in Florida

Contrary to what Defendant's arguments may suggest [DE 65 at 26], Florida firmly embraces the doctrine of *contra proferentem* (the "against-the-drafter rule") as a fundamental rule of contract interpretation especially as relates to insurance policies. *Contra proferentem* as relates to insurance policies is not simply a little-used "tie breaker" or secondary doctrine of last resort as Defendant maintains. *Id*.  It is just the opposite: this Court has found it to be a fundamental "<u>tenet</u> of Florida

---

[4]      Defendant extensively cites, for example, to *Gilman v. John Hancock Variable Life Ins. Co.*, 2003 WL 23191098, (Fla. Cir. Ct. 2003), a state trial court opinion, to support its position that parol evidence destroys class certification. DE 65 at 16, 19. However, Florida trial courts do not create precedent. *Wood v. Fraser*, 677 So.2d 15 (Fla. 2d DCA 1996).  Other examples include *Adams v. Kansas City Life Ins. Co.*, 192 F.R.D. 274 (W.D. Mo. 2000) (applying the Missouri law of parol evidence and *contra proferentem* in the class certification context); *Duchart v. Midland Nat'l Life Insurance Co.*, 4:07-cv-00351 (S.D. Iowa July 23, 2009) cited DE 65 at 21 (applying Iowa law of parol evidence); *Bowers v. Jefferson Pilot Fin. Ins. Co.*, 219 F.R.D. 578, 579 ( E.D. Mich. 2004) cited DE 65 n 35 (vacating class certification decision because purported nationwide class would encounter varying interpretations of the parol evidence rule).  Plaintiffs only request certification of a Florida Class.  DE 58 at 1-2.

insurance law that an insurer, as the writer of an insurance policy, is bound by the language of the policy, which is to be construed liberally in favor of the insured and strictly against the insurer." *Freling v. Reliance Std. Life Ins. Co.*, 315 F. Supp. 2d 1277, 1288 (S.D. Fla. 2004)(citing the Florida Supreme Court's decision in *Berkshire Life Insurance Company v. Adelberg*, 698 So 2d 828, 830 (Fla. 1997))(emphasis added).

Similarly, a long line of Florida cases hold it to be a fundamental rule of insurance policy construction under Florida law that "[i]f there is an ambiguity in an insurance policy, that ambiguity should be construed against the insurer." *Amerisure Mut. Ins. Co. v. Am. Cutting & Drilling Co.*, 2009 U.S. Dist. LEXIS 21077 (S.D. Fla. Mar. 17, 2009)(Cohn, J.)(citing the Florida Supreme Court's opinion in *Berkshire Life Ins. Co. v. Adelberg*, 698 So.2d 828, 830 (Fla. 1997); *see* DE 28 at 3 (this Court's previously finding that "an insurer, as the writer of an insurance policy, is bound by the language of the policy, which is to be construed liberally in favor of the insured and strictly against the insurer")(citing *Berkshire Life* 698 So.2d 828, 830); *Meyer v. Hutchinson*, 861 So. 2d 1185, 1188 (Fla. 5th DCA 2003)("Florida courts have also long held that ambiguities in insurance coverage[5] are resolved in favor of the insured.")(citing *Deni Assocs. of Fla., Inc. v. State Farm Ins.*, 711 So. 2d 1135, 1138 (Fla. 1998))(emphasis added); *Flores v. Allstate Ins. Co.* 819 So. 2d 740, 744 (Fla. 2002)(Florida Supreme Court stating it is a "fundamental proposition, where the language in an insurance policy is subject to differing interpretations, the policy language 'should be construed liberally in favor of the insured and strictly against the insurer'")(citation omitted)(emphasis added).[6]

---

[5]    Defendant makes a defense against coverage here. *See Mid Continent Cas. Co. v. L. B. King*, 552 F. Supp. 2d 1309, 1316 (N.D. Fla. 2008)(finding that when a "loss falls within the scope of coverage, but the insurer argues that other factors justify not fulfilling the contract, the insurer is asserting coverage defenses"); DE 32 at 10 (setting forth Defendant's "Third Affirmative Defense" that Plaintiffs' claims are not covered under the Policy).

[6]    *Accord Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1304 (11th Cir. 2008)("If the language lends itself to more than one reasonable interpretation, it is ambiguous and should be construed in the insured's favor and against the policy's drafter.")(citing *State Farm Mut. Auto. Ins. Co. v. Reis*, 926 So. 2d 415, 416 (Fla. 1st DCA 2006)); *Malek v. New York Life Ins. Co.*, 246 Fed. Appx. 635, 637-638 (11th Cir. 2007)("Any ambiguity in the policy *must* be construed against the drafter.")(citing *Purrelli v. State Farm Fire & Cas. Co.*, 698 So. 2d 618, 620 (Fla. 2d DCA 1997))(emphasis added); *National Indem. Co. of South v. Landscape National Indem. Co. of South v. Landscape Management Co., Inc.*, 963 So.2d 361, 364 (Fla 4th DCA 2007)("Ambiguous policy provisions *are* interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy.")(citation omitted)(emphasis added); *Cont'l Ins. Co. v. Collinsworth*, 898 So. 2d 1085, 1088 (Fla. 5th DCA 2005)("It is when the policy provision is ambiguous and subject to differing interpretations that it should be construed strictly against the insurer in favor of coverage . . ."); *Swire Pacific Holdings, Inc. v. Zurich Insurance Company*, 845 So.2d 161, 165 (Fla. 2003)("An ambiguous provision *is* construed in favor of the insured and strictly against the drafter.")(citation omitted)(emphasis added); *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)(Florida Supreme Court finding "ambiguous insurance policy exclusions *are* construed against the drafter and in favor of the insured")(citing *Deni* 711 So. 2d at 1138); *Deni*, 711 So.2d 1135 (Fla.1998)(emphasis added)(Florida Supreme Court rejecting doctrine of "reasonable expectations," stating, "There is no need for it if the policy provisions are ambiguous because *in Florida* ambiguities are construed against the insurer [and t]o apply the doctrine to an unambiguous provision would be to rewrite the contract ....")(emphasis added); *Jefferson Ins. Co. v. Sea World of Fla.*, 586 So. 2d 95, 97 (Fla. 5th DCA 1991)("*it is well settled* that any ambiguity in an insurance contract is resolved in favor of the insured and

**b. Under Florida Law, Extrinsic Evidence is Inadmissible to Dispel Patent Ambiguities; Hence it Cannot be Used to Defeat Class Certification**

Defendant's typicality, commonality, predominance, and superiority challenges rest almost exclusively on Defendant's premise that "there is need to examine highly individualized extrinsic evidence [of each Class Member] to determine the intent of the parties" with respect to each Class Member's Policy, thus class action treatment is impossible [DE 65 at 22; DE 65 at 16-30]. This premise is flawed, however, because it fails to account for critical distinctions in the Florida law of *contra proferentem* (the "against-the-drafter rule") and its effect on the admissibility of parol evidence in insurance disputes.

For instance, Defendant totally overlooks that Florida courts differentiate between latent and patent ambiguities in deciding whether extrinsic evidence is admissible. *Metro Dev. Group, L.L.C. v. 3D-C & C, Inc*., 941 So. 2d 11, 13 (Fla. 2d DCA 2006). This distinction is determinative. The Florida Supreme Court has discerned that when a patent ambiguity exists *contra proferentem* treatment of the insurance policy is warranted. *Da Costa v. General Guaranty Ins. Co*., 226 So. 2d 104, 105 (Fla. 1969)(finding "[w]here two interpretations equally fair may be given, that which provides the greater indemnity will prevail…[t]he patent ambiguity of the policy … requires application of" *contra proferentem*). On the other hand, the Florida Supreme Court has discerned that some courts have found a latent ambiguity may lead to the introduction of parol evidence. *Deni Assocs. v. State Farm Fire & Cas. Ins. Co*., 711 So. 2d 1135, 1139 (Fla. 1998). Along these lines, the "traditional rule [which Florida follows] is that a latent ambiguity may be explained by extrinsic evidence, but that a patent ambiguity may not."[7] *See* 24 Fla. Jur 2d *Evidence and Witnesses* § 467.  On this point, "Florida courts have

_____

against the insurer, because the insurance company drafted the contract")(citing *Saha v. Aetna*, 427 So.2d 316 (Fla. 5th DCA 1983))(emphasis added).

[7]       32A C.J.S. Evidence § 1513 (from which the quoted language is taken---acknowledging the traditional distinction between patent and latent ambiguities); *see Mac-Gray Servs. v. Savannah Assocs. of Sarasota, LLC*, 915 So. 2d 657, 659 (Fla. 2d DCA 2005)(citing among others, *Bradley v. Washington, Alexandria, & Georgetown Steam Packet Co*., 38 U.S. 89, 97 (1839)(explaining "extrinsic evidence . . . is admissible to explain a latent ambiguity"--that is, "one not apparent on the face of the instrument, but one arising from extrinsic evidence"--because doing so "is but to remove the ambiguity by the same kind of evidence as that by which it is created."); *see also Olin's, Inc. v. Avis Rental Car System, Inc*., 141 So. 2d 609, 612 (Fla. 3d DCA 1962)(citing *Friedman v. Virginia Metal Products Corp*., 56 So.2d 5135 (Fla. 1952) cited by Defendant, DE 65 at 16, n 25).  The *Olin* court discerned *Friedman* to be a latent ambiguity case, thus extrinsic evidence was permitted. Defendant failed to draw this distinction when it cited *Freidman*. That case also predates by several decades the pronouncements of the Florida Supreme Court in more recent decisions like *Da Costa*, 711 So. 2d 1135 and *Deni*, 711 So. 2d 1135, which indicate the Florida Supreme Court recognizes the distinction between latent and patent ambiguities and has rejected allowing the "reasonable expectations" of insureds (and attendant extrinsic evidence) to be introduced to explain ambiguities.  "[T]he [US] Supreme Court has suggested that a federal court may decline to follow an old decision if a developing line of authorities, dicta, or legislative developments indicate that the state's highest court would no longer follow the decision." 17A-124 Moore's Federal Practice - Civil § 124.20.  "Several [federal] appellate courts have followed this approach." *Id*.  As stated *infra*, the most recent indications from the Florida Supreme Court are that it follows the *contra conferentem* rule and the corollary disallowance of the introduction of parol evidence to dispel patent ambiguities.

consistently declined to allow the introduction of extrinsic evidence to construe [a patent] ambiguity." *Emergency Assocs., P.A. v. Sassano*, 664 So. 2d 1000, 1002 (Fla. 2d DCA 1995)(citations omitted); *accord Beach St. Bikes, Inc. v. Bourgett's Bike Works, Inc*., 900 So. 2d 697, 700 (Fla. 5th DCA 2005)(citation omitted); *Mac-Gray Servs. v. Savannah Assocs. of Sarasota, LLC*, 915 So. 2d 657, 659 (Fla. 2d DCA 2005); *First Guar. Corp. v. Palmer Bank & Trust Co., N.A*., 405 So. 2d 186 (Fla. 2d DCA. 1981).

Although not cited by Defendant, the Florida Supreme Court's opinion in *Deni,* 711 So. 2d 1135, confirms that *contra proferentem is* the law in Florida and as a corollary the admission of extrinsic evidence to dispel patent ambiguities would be improper. In *Deni*, the Florida Supreme Court expressly declined to adopt the "doctrine of reasonable expectations" under which a fact-finder may "look at the totality of the circumstances in determining the intent of the parties, rather than being strictly confined to the four corners of a standardized agreement." *Id*. at 1140; (quotation taken from *Max True Plastering Co. v. United States Fidelity & Guar. Co*., 912 P.2d 861, 867 n 30 (Okla. 1996)(citation omitted)(cited in *Deni*, 711 So. 2d at 1140). Under the reasonable expectations doctrine, the "totality of the circumstances" necessarily includes an examination of extrinsic evidence which constitutes a relaxation of the parol evidence rule.[8] This is exactly what Defendant argues must be allowed with respect to each Class Member here.

But, in *Deni*, the Florida Supreme Court rejected the "totality of the circumstances" approach Defendants espouses on the basis there was no need for it if the policy provisions were ambiguous because "... in Florida ambiguities are construed against the insurer." *Id*.   In other words, under *Deni*, once the court discerns a patent ambiguity, the rule of *contra proferentem* automatically dictates the construction of the Policy, which eliminates the need to probe beyond the policy text to search out extrinsic evidence. *See* Susan Randall, *Freedom of Contract in Insurance*, 14 Conn. Ins. L.J. 107, 120-121 (2007-2008)(internal citations omitted)(observing that *contra proferentem* as applied to insurance policies mandates that "[o]nce the court finds an ambiguity, the interpretation favoring the policyholder prevails, without reference to the parties' intent and without examination of extrinsic evidence…)  Indeed, relying on *Deni*, the Fourth District Court of Appeal has found that "a reasonable belief [of a party] contrary to the plain meaning of policy text--or even to unclear text capable of being fairly read to provide coverage--is irrelevant to construction of the policy." *Lenhart v. Federated*

---

[8]     *See, e.g*., *AMTRAK v. Lexington Ins. Co*., 445 F. Supp. 2d 37, 41 (D.D.C. 2006)(D.C. law); *Bradley v. Western & Southern Fin. Group*, 2005 U.S. Dist. LEXIS 26003 (N.D. Ind. Oct. 20, 2005)(Indiana law); *Allstate Ins. v. Shelton*, 105 F.3d 514, 516 (9th Cir.1997)(Alaska law); *Darner Motor Sales v. Universal Underwriters Ins. Co*., 140 Ariz. 383 (Ariz. 1984)(noting the that the "reasonable expectations doctrine" essentially constitutes a relaxation of the parol evidence rule).

*National Ins. Co.*, 950 So.2d 454, 461 (Fla. 4th DCA 2007)(citing and quoting *Deni*, 711 So.2d at 1140). Similarly, on the purported need to examine the circumstances of an insurance transaction, this Court has noted that *Deni* had been construed to "preclude[] testimony from either the insurer or the insured as to their respective intentions regarding coverage." *Monticello Insurance Co. v. City of Miami Beach*, 2009 WL 667454 *10 (March 11, 2009 S.D. Fla.)(citing the *Lenhart* court's interpretation of *Deni*).

"A patent ambiguity is one that appears on its face." *Saenz v. Campos*, 967 So. 2d 1114 (Fla. 4th DCA 2007)  "A latent ambiguity-as distinct from a patent ambiguity-arises 'where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings.'" *Id.* (citations omitted); *see Wheeler v. Wheeler, Erwin & Fountain, P.A.*, 964 So. 2d 745, 749-750 (Fla. 1st DCA 2007)(citations omitted); *see generally Black's Law Dictionary* (8th ed. 2004)(defining the different types of ambiguities under the entry for "Ambiguity").   In this case, neither Plaintiffs nor Defendant has cited any extrinsic fact or document which creates the ambiguity in its Policy. Instead, Plaintiffs challenge an ambiguity arising solely from the face of the Policy - namely, whether or not when reading the Policy as a whole, an 8 % annual benefit increase called for under the Certificate Schedule applies to the Daily Maximum benefit under the Policy, or whether it also applies to the Lifetime and Per Occurrence benefits under the Policy.   This approach has been already taken on Defendant's Policy in at least two instances. In its order denying Defendant's motion to dismiss [DE 28], this Court reviewed the four corners of the Policy, found ambiguity, and confirmed that *contra proferentem* applied. *Id.* at 6.   No extrinsic evidence was reviewed.   In like manner, in reviewing the face of the same Policy at issue here, the Eleventh Circuit found the Policy on its face was ambiguous, the intent of the parties (the insurer) was not relevant and thus as in *Deni*, *contra proferentem* applied; as the Eleventh Circuit held:

> Reading the Benefits section in conjunction with the Certificate Schedule, there is an ambiguity as to whether the Automatic Benefit Increase applies to the Lifetime Maximum Benefit. *While the insurer may have intended that the Automatic Benefit Increase apply exclusively to the daily Home Health Care Benefit, it is not plain that the policy should be construed so narrowly. Because the policy is ambiguous, we resolve the issue in favor of Mrs. Gradinger and against the insurer, the drafter of policy.*

(citation omitted)(emphasis added); *see* Exhibit A hereto (*Gradinger v. Washington National Ins. Co.*, Eleventh Circuit Case No. 06-16164).

### c. The Language of the Policy Contradicts Defendant's Position that Extrinsic Evidence Should Be Consulted

The language of Policy and Defendant's own witnesses evidence that parol evidence is inadmissible and insufficient, too. In its class certification motion response [DE 65], Defendant failed to discuss that each Policy issued to Class Members provided that the Policy and the insurance application were expressly designated as the "Entire Contract" and that no one besides Defendant could change the Policy or bind Defendant. DE 58-3 at 43; Exhibit B hereto (collecting highlighted excerpts of Policy pages containing the "Entire Contract" clauses for Policy versions Defendant has produced).

In accordance with the "Entire Contract" provision, Defendant's Florida sales agent, Roy Weinberg, who sold most of Defendant's Policies in Florida, testified under Florida law he had no authority to bind any insurer, including Defendant. *See* Exhibit C hereto, Deposition of Roy Weinberg ("Weinberg Dep."), 14:1-6, 44:14-17, 44:23-25, 45:1. The Policies were sold in the 1990's. Weinberg Dep. 23:22-24, 55:1-9.  He received up to 70 % commissions first year, and continues to receive 15% commissions for life of Policy. Weinberg Dep. 52:21-22, 53:1-2.  Mr. Weinberg further testified that he possessed no correspondence sent to an insured which informed her or him that the 8 % annual benefit increase only applied to the Daily Benefit of the Policy [Weinberg Dep. 81:17-21]; that he had no memo or correspondence of any kind from Defendant stating that the 8% annual benefit increase only applied to the Daily Benefit of the Policy and did not apply to the Per Occurrence and Lifetime Maximum Benefits [Weinberg Dep. 81:22-25, 82:1-7, 84:13-14]; and that he had nothing in his files on Plaintiff Sylvia Powers (whose Policy he solicited) which indicated she was advised that the Per Occurrence and Lifetime Maximum Benefits did not increase by 8 % annually. Weinberg Dep., 88:1-6. He also acknowledged he had no written documents memorializing what he told insureds at the time he sold them the Policy [Weinberg Dep. 81:21-25]; in truth, it was impossible to document his sales presentations [Weinberg Dep. 85:10-11]; there was no way to remember what he exactly said because of thousands of customers spanning transactions over 20 years. Weinberg Dep. 85:22-25, 86:1-4. He also confirmed that the Policy was the operative document. Weinberg Dep. 66:23-25, 67:1.

Like Weinberg, Defendant's actuary witness, Dawn Helwig, has received money from her business relationship with Defendant.  She is even being paid for her testimony. *See* Exhibit D hereto, Deposition of Dawn Helwig ("Helwig Dep.") 18:17-20. As Weinberg did, she understood that Plaintiff's case concerned the Policy language. Helwig Dep. 13:17-19.  However, unlike Weinberg, she herself never spoke to insureds with respect to the Policy. Helwig Dep. 57:1-3.  Her actuarial memo,

that Defendant has introduced as evidence in this case [DE 66] was not presented to Class Members and she admitted that the Certificate Schedule at the center of this dispute likely was not part of her analysis either [Helwig Dep. 12:4-17, 13:23].  She stated the memo was not an insurance Policy [Helwig Dep. 13:24, 14:1]. The Certificate Schedule and Policy created the insurance. Helwig Dep. 32:6-9. She also testified she would expect that Policy language would be followed to determine coverages. Helwig Dep. 14:9-12.  Under oath, Ms. Helwig agreed that consumers could not negotiate the Policy language [Helwig Dep. 36:12-14], and testified that "Entire Contract" clause referred to above meant sales agents could not change terms of the Policy. Helwig Dep. 37:19-22. She confirmed that clause meant the insurance contract and all Policy terms and conditions were contained in the Policy itself.  Helwig Dep. 37:23-24, 38:1-2. In addition, she had no evidence or recollections of any conversations with state regulators about the 8% Annual Benefits increase.  Helwig Dep. 48:20-23, 49:8-14.  Indeed, on this issue, it appears that the state filing in which Defendant included a sales brochure it claims is admissible as parol evidence, was deemed "unacceptable." *See* DE 69-49 at 2 (Exhibit 48 to the Declaration of Jeffrey J. Amato).

### d.  Public Policy Disallows the Introduction of Parol Evidence in this Case

Beside the weight of Florida decisions and the deficiencies in Defendant's evidence and factual presentation, there are important public policy considerations at stake for declining to permit extrinsic evidence here. Among other things, the Florida Supreme Court in *Deni* was concerned that construing insurance policies upon a determination beyond the four corners of a policy as to whether or not "subjective expectations are reasonable can only lead to uncertainty and unnecessary litigation." 711 So.2d at 1140. This concern is consistent with the general judicial predisposition toward the insured in disallowing extrinsic evidence to dispel a patent ambiguity created by a policy drafter: "[I]nsurance policies, while contractual in nature, are certainly not ordinary contracts, and should not be interpreted or construed as individually bargained for, fully negotiated agreements, but should be treated as contracts of adhesion between unequal parties." Richard A. Lord, *Williston on Contracts*, § 49:15. "Because [such] standard forms are not negotiated and often go unread, they are not subject to the same [transactional] scrutiny as bargained-for exchanges." David Horton, *Flipping the Script: Contra Proferentem and Standard Form Contracts*, 80 U. Colo. L. Rev. 431, 476 (Spring 2009). "As a result, they invite opportunism." *Id*.  In this vein, to allow an insurer to introduce extrinsic evidence in an attempt to resolve a patent ambiguity in its own form insurance contract could incentivize insurers to purposefully draft ambiguous policies to avoid liability, thwart aggregation of claims, and maximum confusion to their benefit. "Tactical ambiguity can be especially useful for harsh terms, which firms

have ulterior reasons to obscure, and which are more likely to generate litigation." 80 U. Colo. L. Rev. 431, 477.  The rule confirmed in *Deni* guards against this potential for uncertainty and mischief, which Defendant now seeks to inject into Florida law.

Additionally, it is out of place for Defendant to claim that *its* *own* Policy whose language *it* entirely controlled is ambiguous and then capitalize on such ambiguity to maintain that evidence must be adduced to capture varying interpretations based on the intent and circumstances of each Class Member.   This position not only contradicts Defendant's admission that the Policy contains standardized terms [DE 58-3 at 16—Response to Request for Admission No. 24], but also it runs counter to the very purpose of having standardized insurance agreements in the first place.  Insurance is regulated to protect the public health and welfare. *See* § 627.9402, *Fla. Stat.* (noting the purpose of long term care insurance standards is "to promote the public interest").[9]  Non-uniformity, unpredictability,   and   uncertainties   in   mass-produced   insurance   policies   are   antithetical   to   such purposes.[10] *See* § 627.419 *Fla. Stat.* (mandating that "[e]very insurance contract *shall be* construed according to the entirety of its terms and conditions *as set forth in the policy and as amplified, extended, or modified by any application therefor or any rider or endorsement thereto*."); *Allstate Ins. Co. v. Kaklamanos*, 843 So. 2d 885, 896 (Fla. 2003)(policy must be consistent with, construed and applied to effectuate the purpose of insurance code).  Along these lines, this Court in *Monticello Insurance Co. v. City of Miami Beach*, 2009 WL 667454,[11] which Defendant extensively relies on to

---

[9]      Arguably, applying the 8% annual increase to all benefits as stated in the Certificate Schedule, not only furthers the goal of the Policy, but also furthers the goal of the mandatory policy provision effective October 1, 1992, and contained in § 627.94072(1)(a), *Fla. Stat.*, which reads in pertinent part: "An insurer that offers a long-term care insurance policy, certificate, or rider in this state must offer, in addition to any other inflation protection, the option to purchase a policy that provides that benefit level<u>s</u> increase with benefit maximum<u>s</u> or reasonable duration<u>s</u>, to account for reasonably anticipated increases in the costs of services covered by the policy." (emphasis added)

[10]      Whatever pre-approval process Defendant's Policy may have undergone in Florida; it is for a court rather than the state of Florida to determine whether the Policy complies with Florida law.  *See Gonzalez v. Assocs. Life Ins. Co.*, 641 So. 2d 895, 897 n 1 (Fla. 3d DCA 1994).  Significantly, it appears potentially as least that the attempted filing including the brochure Defendant argues is appropriate extrinsic evidence in this case was deemed "unacceptable" by the state of Florida. *See* DE 69-49 at 2.  Note that the state's File No. listed in the state's letter in DE 69-49 for the brochure and other forms being filed appears to be different from the File Nos referred to in other Exhibits where the state appears to have accepted the form filing.  Contrast the correspondence appearing in the Court's docket, DE 69-49 at 2, with state File Nos. listed in correspondence in the record, DE 69-40 at 2 and DE 69-41 at 2.

[11]      The *Monticello* decision and Defendant included citations to several cases, which either do not control the parol evidence issue Defendant raises or simply do not apply. For example, the *Monticello* opinion and Defendant cite the very brief *per curiam* decision in *Williams v. Essex Ins. Co.*, 712 So. 2d 1232 (Fla. 1st DCA 1998). DE 65 at 24, n 25; 2009 WL 667454 *9.  *Monticello* is the only state or federal court which has cited *Essex*.  But, the First District Court of Appeal in *Essex* failed to discuss the patent versus latent ambiguity distinction.  Nearly ten years after *Essex*, the Florida First District Court of Appeal held "[e]xtrinsic evidence [wa]s admissible regarding the intent of parties to a contract *only if* a latent ambiguity exists." *Wheeler*, 964 So. 2d 745, 749 (emphasis supplied). *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228 (11th Cir.2002) is also cited in *Monticello* and by Defendant. DE 65 at 18; 2009 WL 667454 *9.  But, *Arriaga* was not an insurance case and *Arriaga* actually supports Plaintiffs' position. Quoting *Child v. Child*, 474 So.2d 299, 301 (Fla. 3d DCA 1985), the Eleventh Circuit distinguished insurance policies from other contracts and determined the "construction-against-

support its position [DE 65 at 16, 18], noted the impropriety (and irony perhaps) of an insurer's espousing a position akin to the "reasonable expectations" doctrine rejected in *Deni*:

> Here, it is the insurer and not the insured, that seeks to invoke the doctrine. To apply the doctrine to an ambiguous policy … in favor of the insurer, would be contrary to Florida law, negate the traditional construction guide-lines, and ultimately rewrite the insurance policy in favor of the insurer when the insurer did not draft the policy in its favor in the first place.

2009 WL 667454 *10 n 9. The *Monticello* court rejected the extrinsic evidence presented and noted that because the language at issue created a patent ambiguity, "there [wa]s less compelling necessity to resort to parole evidence."[12]  2009 WL 667454 *9 n 7.

Accordingly, under Florida law, parol or extrinsic evidence is inadmissible and Defendant cannot maintain that extrinsic must be presented in every Class Member's insurance transaction to defeat class certification.

---

the-draftsman" rule "may be decisive when, *as in the case of contracts of adhesion such as insurance policies*, there is no other evidence at all of intent beyond the words themselves." 305 F.3d at 1248. Moreover, *RTG Furniture Corp. v. Indus. Risk Ins*., 2008 WL 4541022, *6 (S.D.Fla., Oct.9, 2008) to which *Monticello* cited [2009 WL 667454 *10] is inapplicable: In that case, this Court declined to invoke the *contra preferentem* rule because unlike here the insured in that case was a sophisticated business person who participated equally in drafting the disputed provision. 616 F.Supp.2d 1258, 1266 n 6. Defendant has admitted that Plaintiffs did not draft Defendant's Policy. DE 58-3 at 10, Response to Request No. 5. Defendant and its agents drafted the Policy. *Id*.

*Monticello* and Defendant also included citations to *Northside Marina Ventures, LLC v. Lexington Ins. Co*., 2007 WL 2316502, *4 (Fla. 2007) [DE 65 at 16; 2009 WL 667454 *10], but that case involved a latent ambiguity, because the ambiguity arose as the result of extrinsic facts and evidence: each party disputed the meaning of "Statement of Values" and which extrinsic document that phrased referred to; the *Marina Ventures* court further noted is was unclear which property was being insured.  Like *Marina Ventures*, *Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co., Inc*., 2003 WL 21146714 (S.D. Fla. 2003)[cited by Defendant, DE 65 at 20], involved a latent ambiguity created by a fact or occurrence extrinsic to the contract. *Jim Moore* did not involve an insurance policy, but a sales agency agreement between the parties. The parties in *Jim Moore* both acknowledged that parol evidence would be necessary to resolve their dispute. 2003 WL 21146714 *1.  The ambiguity in *Jim Moore* was brought about by a change in the National Flood Insurance Act of 1968 (an event extrinsic to the contract) which rendered a reference to a "governmental or insurance industry plan or facility" in the insurance agents' agency contracts with State Farm ambiguous. *Id*.  Defendant further relied on *Gilman v. John Hancock Variable Life Ins. Co.*, 2003 WL 23191098, (Fla. Cir. Ct. 2003), a Florida trial court order.  As a trial court order, *Gilman* is not authoritative or precedential. *See Nussbaum Co*., 913 F. Supp. 1548, 1554 (holding that a federal court is bound to follow the Florida Supreme Court and intermediate appellate courts); *Beach St. Bikes, Inc. v. Bourgett's Bike Works, Inc*., 900 So. 2d 697, 699 (Fla. DCA 2005)("A lower court's interpretation of a contract is subject to a de novo standard of review" by a Florida District Court of Appeal."); *Wood v. Fraser*, 677 So.2d 15 (Fla. 2d DCA 1996)(holding Florida trial courts do not create precedent)(citations omitted). Nor is it germane.  *Giliam* was an attempted national class action (not a Florida-only class)[ 2003 WL 23191098 *11], and there were dozens of policies at issue (unlike here) [2003 WL 23191098 *8].  Also, there were fundamental problems with proof and identifying class members. 2003 WL 23191098 *6.  Here, on the other hand, Defendant has identified Rule 23 (b)(2) and (b)(3) Class Members. DE 65 at 8; DE 68; DE 86.

[12]     Another federal court sitting in Florida has adhered to this distinction with respect to insurance policies. *See Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.)*, 175 B.R. 98, 109 (Bankr. M.D. Fla. 1994)(noting a "latent ambiguity in a policy term is where language is employed in a policy that is clear and intelligible and suggests a singular meaning, but some extrinsic fact or extraneous evidence creates a necessity for a reasonable interpretation of two or more possible meanings. Patent ambiguities appear from the face of the instrument and arises from a defect in language used.")(citing *Ace Electric Supply Co. v. Terra Nova Electric*, 288 So.2d 544 (Fla. 1st DCA 1973)).

IV.    COMMON QUESTIONS PREDOMINATE UNER RULE 23(b)(3)

Another tactic Defendant utilizes is to meld together indiscriminately questions of liability and damages in order create the overall picture of an unwieldy, disparate group of Class Members to defeat predominance of common questions under Rule 23(b)(3). This attempt is unavailing.  As this Court found in *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 695 (S.D. Fla. 1992):

"The Defendants' arguments "miss the forest for the trees" …The Defendants' portrayal of the case as a protracted series of disconnected events is creative but misleading."

### a.    Predominance Focuses on Liability Not Damages

Contrary to what Defendant indicates,[13] predominance focuses on liability not damages. *See Williams v. Mohawk* Indus., 568 F.3d 1350, 1357 (11th Cir. 2009)(citations omitted); *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. Fla. 2004)(finding "primarily when there are significant individualized questions going to liability" only then will need for individualized assessments of damages preclude 23(b)(3) certification); *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 428 (4th Cir.2003)(when "common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied")  "The required predominance of common issues does not [however] mean that individual issues must be non-existent" or that all issues be common. *Bussian v. Daimler Chrylser Corp.*, No. 04-387, 2007 WL 1752059 *7 (M.D.N.C. June 18, 2007); " *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 692 (N.D. Ga. 2003)(citation omitted). "[I]n general, predominance is met when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1260-1261 (11th Cir. 2003) (internal quotation marks and citation omitted).

### b.    Defendant's Policies Are Not Materially Different

Several predominant factual questions concerning liability are (1) whether or not each putative Class Member's Policy contains a Certificate Schedule with the three benefits at issue (the Daily Maximum Benefit, Per Occurrence Maximum and Lifetime Maximum Benefits); (2) whether or not on the Certificate Schedule appears the phrase "AUTOMATIC BENEFIT INCREASE PERCENTAGE Benefit*s* increase by 8% each year" (emphasis added); and (3) whether language in other parts of the Policy is materially different in ways that would bear upon the 8 % increase which Plaintiffs maintain

---

[13]        DE 65 at 22 (conflating liability and damages for Rule 23(b)(3) analysis); DE 65 at 25 (mixing coverage and damage questions).

is at the heart of this dispute.  On all three of these points, Defendant contends the "Policies are materially different, in the most important ways." DE 65 at 1.  This is inaccurate.  Each Class Member has the same basic form.

*First*, Defendant contends that spacing of the 8 % modifying language *vis-à-vis* the foregoing maximums is materially different among the Policies and that Plaintiffs and the Eleventh Circuit in *Gradinger* [Ex. A hereto] deemed that such spacing was "critical." DE 65 at 4.  The underpinnings of this attack lie in Plaintiffs' complaint: Defendant tries to turn the emphasis <u>Plaintiffs expressly stated</u> <u>was supplied</u> in two paragraphs of their First Amended Complaint [DE 30 at ¶¶ 16 and 17] into a material difference, because the emphasis (including extra spacing) does not appear in some Policies. DE 65 at 4.  Neither Plaintiffs, nor the Eleventh Circuit, nor this Court has ever described this spacing as "critical" to their analysis of the Policy. This Court (following *Gradinger*) and the Eleventh Circuit in *Gradinger* both ruled that Policies with or without presence of the space were ambiguous and must be construed in the insured's favor. *See Gradinger* [Ex. A hereto](with the space); DE 28 at 5 (without the space).  Spacing is not material.  Plaintiffs have not argued it was and no Court of which Plaintiffs are aware has ruled it was.

*Second*, Defendant maintains that the "Policies' definition of home health care varies significantly." DE 65 at 30.  Attached hereto and collected in Exhibit E are the "Home Health Care" definitions excerpted from the Policies Plaintiffs were able to locate from Defendant's document production. Defendant's most prolific sales agent in Florida, Roy Weinberg, testified that he only sold Policies containing the form codes "9264" and the "9311." Weinberg Dep. 54:21-25. He also testified the benefits in the two Policies were identical. Weinberg Dep. 29:5-9. A review of these definitions and Mr. Weinberg's testimony belies Defendant's conclusion that they "vary significantly."  No "Home Health Care" definition modifies or even mentions the Policy benefits at issue or the 8 % annual benefit increase.

*Third*, Defendant asserts that some Policies vary in the conditions that must be met for benefits to be paid, because some required prior hospitalization. DE 65 at 30-31 (citing DE 58-4 at 7 and DE 58-3 at 41). But, Mr. Weinberg testified he always sold a rider which eliminated this prerequisite. Weinberg Dep. 27:5-9.  In fact, this requirement has been unlawful in Florida for long term care policies. *See* §§ 627.9404(1), 627.94071(1), 627.94074, *Fla. Stat*.   Nevertheless, even if it had been offered in Florida, in reading these conditions, this distinction has no relevance to the Daily Maximum Benefit, Per Occurrence Maximum and Lifetime Maximum Benefits and their annual increase by 8 %, and therefore it is not germane to liability as pled in Plaintiffs' case.

13

The upshot: the Court file contains numerous copies of Policies each side has submitted. DE 1 at 9-7; DE 18-2; DE 30 at 18-38; DE 58-3 at 21-46; DE 58-4; DE 58-5; DE 69-26 at 6-16; DE 69-27 at 6-14; DE 69-31; DE 69-32; DE 69-43. These copies reveal that the Policy issued to Plaintiffs and Class Members all included a one-page Certificate Schedule with the same basic format of benefits: the Daily Benefit, the Lifetime Maximum Benefit, and the Per Occurrence Maximum Benefit, modified by the "AUTOMATIC BENEFIT INCREASE PERCENTAGE Benefit increase by 8% each year."  No Policy states that the Automatic Benefit Increase does not apply to either of the maximum benefits. Instead, each time the policy discusses either maximum benefit, the Policy directs the reader to the Certificate Schedule.  This Court and the Eleventh Circuit based there legal determinations about the Policy based on these facts gleaned from the face of the Policy.  They apply equally to each Class Member because their Policies do not vary in any material way from Plaintiffs on these core provisions.  Defendant cannot defeat predominance based on inconsequential variations in the Policy. *See Steinberg v. Nationwide Mut. Ins*. Co., 224 F.R.D. 67, 79 (E.D.N.Y. 2004)(finding predominance and rejecting arguments about insurance policy "differences are not relevant to the adjudication of the plaintiffs' claim").

### c.   Factual and Legal Questions Relating to the Breach Predominate

Plaintiffs propose Florida-only Classes, thus one state's law applies to evaluate the elements of Plaintiffs' alleged breach of the uniform Policy at issue. To make this litigation look exceedingly complicated, however, Defendant tries to paint Plaintiffs' case as a dispute about whether certain care was medically necessary or whether certain home health aides were qualified. This is misguided.  The predominant legal right under Florida law Plaintiffs are claiming arises from the language of the Policy itself with respect to the 8 % increase which is identical for every Class Member. The predominant liability question (for breach of contract and for the injunctive relief)[14] is whether or not Defendant violated this right (*i.e.*—Defendant had a legal duty under the Policy and breached it) by denying Plaintiffs and Class Members an 8% annual increase in the Lifetime Maximum and/or Per Occurrence Benefits under the terms of the Policy. *See Black's Law Dictionary* (8th ed. 2004)(defining a "breach" as "[a] violation or infraction of a law or obligation"); *Allapattah Servs. v. Exxon Corp*., 333 F.3d 1248, 1260 (11th Cir. Fla. 2003)(finding to determine predominance court must examine the cause of action  asserted in the complaint on behalf of the putative class)(citation omitted).

---

[14] *See Klay v. United Healthgroup, Inc*., 376 F.3d 1092, 1097 (11th Cir. 2004)(finding that a traditional injunction must be predicated on some cause of action or legal right).

Because the Policy is substantially similar in key respects and parol evidence is inadmissible, incompetent and/or irrelevant, establishment of this right and its violation would be subject to class-wide proof. The Policy and its language are the fixed source of the rights and duties of the Parties.  If Plaintiffs establish that the Policy language gives rise to the claim they assert, doing so would directly impact every Class Member's claim and entitlement to relief.  As a result, predominance exits. *See Ingram v. Coca-Cola Co*., 200 F.R.D. 685, 699 (N.D. Ga. 2001)("Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to establish *liability* and on every class member's *entitlement* to injunctive …[or] monetary relief.'")(cited in *Klay*, 382 F.3d 1241, 1255)(emphasis added); *see also*, *MSM Golf, L.L.C. v. Newgent*, 853 So. 2d 1086, 1087 (Fla. 5th DCA 2003)("*It is a fundamental principle of contract law that once liability for a contract breach is established, an injured party* is *entitled as a matter of right* to compensatory damages" even if only nominal.); *Onontario of Fla., Inc. v. R. P. Trucking Co., Inc.*, 399 So. 2d 1117, 1118 (Fla. 4th DCA 1981)(*once a breach occurs injury occurs even in the absence of evidence regarding the correct measure of damages*)(citation omitted); *Black's Law Dictionary* (8th ed. 2004)(defining "breach of contract" and stating: "*Every breach gives rise to a claim for damages, and may give rise to other remedies…[e]ven if the injured party sustains no pecuniary loss or is unable to show such loss with sufficient certainty, he has at least a claim for nominal damages*.")(citing Restatement (Second) of Contracts § 236 cmt. a (1979)). This distinction between liability for breach and the corollary entitlement to relief (even in the absence of pecuniary loss) on the one hand, and proof of damages of the breach on the other, is lost on Defendant. Predominance deals with the former, but not the latter. *See United Wis. Servs. v. Abbott Labs. (In re Terazosin Hydrochloride Antitrust Litig.)*, 220 F.R.D. 672, 700 (S.D. Fla. 2004)(rejecting manageability arguments based on conflation of the fact of injury and the quantum of injury); *Feinberg v. Empire Blue Cross & Blue Shield*, 1989 U.S. Dist. LEXIS 10463 (S.D.N.Y. Aug. 8, 1989)(finding predominance where common to all potential plaintiffs in this case included whether defendant breached its obligations under the insurance policy and whether the policy made false or misleading representations.)

## V.    THE CLASSES ARE NUMEROUS AND NEED NOT BE SUB-DIVIDED

Defendant continues its theme that this case presents diversity and complexity in its challenge to numerosity under Rule 23(a)(1). Defendant claims that the Classes Plaintiffs propose *must* be subdivided and that because the subclasses cannot individually meet the numerosity requirement, this case cannot be certified.  Defendant's analysis is wrong, again because it uses a broad brush to depict the strictures of Rule 23.  There are two types of Rule 23 subclasses: case management subclasses

created for convenience at trial under Rule 23(d), and formal subclasses certified under Rule 23(c)(5). *Casale v. Kelly*, 257 F.R.D. 396, 408-409 (S.D.N.Y. 2009).   A recent summary of the sub-classing mechanisms called for in Rule 23 is instructive:

> In conducting an action under [Rule 23], the court may issue orders that determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument . . . [or] deal with similar procedural matters. <u>A case-management subclass may be created solely to expedite resolution of the case by segregating [a distinct legal] issue [that is] common to some members of the existing [class]. Case-management subclasses are an appropriate procedural innovation under Rule 23(d), when there is no actual conflict among class members in the underlying claims common to the  entire class. When the subclassification [is] appropriate under Rule 23(d), it is unnecessary to evaluate it under Rule 23[(a)] for commonality, numerosity, typicality, and adequacy of representation.</u> On the other hand, <u>formal certification of subclasses pursuant to Rule 23(c)(5)is the proper solution if a court discerns a conflict among members of a proposed class or class members assert divergent claims based on non-overlapping factual circumstances, harms, and systemic failures.</u>

*Id.* (internal citations and quotations omitted).   What Defendant argues must be created and what it claims defeats numerosity is a case management subclass, not a formal subclass.[15] DE 65 at 42. By definition, though, case management subclasses are simply a procedural convenience and need not meet the numerosity requirement. *Casale*, 257 F.R.D. 396, 408-409 (citing several authorities including, Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 7:33 (4th ed. 2002)).   Hence, the permissibility of a case management subclass Defendant identifies cannot defeat numerosity as Defendant suggests. Moreover, Defendant has not identified and cannot identify "divergent claims based on non-overlapping factual circumstances, harms, and systemic failures" so as to warrant formal sub-classing of the Rule 23 (b)(2) and Rule 23(b)(3) Classes Plaintiffs propose because the Policy and the predominant legal and factual questions are the same for each Class Member. *See Karen L. v. Physicians Health Servs.*, 202 F.R.D. 94, 106 (D. Conn. 2001)(declining to subclass because "[t]here [wa]s no indication that subclasses [we]re needed to protect the rights of various class members who might conflict").

Numerosity is not defeated by Defendant's recent declaration by its counsel, either. DE 86. "There is no rigid standard for determining numerosity." *Hicks v. Client Servs.*, 2008 U.S. Dist. LEXIS 101129 (S.D. Fla. Dec. 10, 2008).   A "plaintiff's estimate [of the class size] need only be reasonable."

---

[15]      Defendant cited *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1129 n 38 (7th Cir. 1979) to support its position.  That case, however, was a settlement class case.  The court mentioned in a footnote the permissibility of creating a management subclass *at trial*, which is not the situation here.  *General Motors* did not link sub-classing to numerosity as Defendant attempts to do.

*Fabricant v. Sears Roebuck & Co.*, 202 F.R.D. 310, 313 (S.D. Fla. 2001) Defendant has submitted a supplemental declaration of its counsel in attempt to defeat numerosity. DE 86.  Given that this declaration was submitted by Defendant's counsel roughly seven business days before Plaintiffs' Reply was due and given that defense counsel has not been deposed (and that no doubt Defendant would vigorously oppose such deposition), the more balanced evidence of numerosity in the Court record is the deposition testimony of Defendant and its corporate designee deponent who testified to the information upon which Defendant's counsel now opines and whose testimony defense counsel seeks to amend. Plaintiffs incorporated Defendant's corporate representative's testimony into their class certification motion. DE 58 at 9-10.

Defendant's corporate representative had identified 700 unique Policy numbers under which claims had been paid during the period September 2003 through May 2009; (2) that from that 700 group he could identify those Policies whose claims had been rejected; and (3) that he was then able to cross reference those rejected claims to determine that they had been rejected for reaching maximum benefit amounts on the Policy, which included 81 unique Policies. *Id.*  Defendant has also submitted amended interrogatory answers which indicate that there may be upwards of 87 Rule 23(b)(3) Class Members. *See* Exhibit G hereto, Response to Interrogatory Nos. 1 and 2.

Plaintiffs, less than a week before this Reply was due, received from Defendant 175 pages relating to "maximum policy audits" apparently conducted of the 81 Policies, which the Parties are reviewing as to confidentiality. *See* Exhibit F hereto (cover letter for the production).   Even if these materials on the 81 putative Class Members are not entirely supportive of the 81 Policies as Defense counsel's declaration maintains [DE 83], Defendant still admits that there are 36 Class Members in the Rule 23(b)(3) Class. *Id.* at ¶ 8. The Eleventh Circuit has held that "while there is no fixed numerosity rule, 'generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.'" *Cox v. American Cast Iron Pipe Co*, 784 F.2d 1546, 1553 (11th Cir. 1986)(citation omitted). Thirty-six falls within the realm of numeriosity identified in *Cox*, and "hovers near the number which most generally agree will satisfy the numerosity requirement." *Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 43 (S.D.N.Y. 1990)(certifying class of 36 members and collecting cases); *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986)(class of 29 members certified).

Also, the numerosity requirement is not simply a numerical requirement. "Impracticability as used in Fed. R. Civ. P. 23(a)(1) has been defined as 'impractical,' 'imprudent' or 'unwise' rather than 'incapable of being performed.'" *Town of New Castle*, 131 F.R.D. at 40.   "The need to avoid

duplicative litigation is significant even when the class is small." 2 *Newberg on Class Actions* § 4:39 (4th ed.)(2009). A group of intervenors has already attempted to enter this case. DE 78.  As one court opined in certifying a class of 35 members, "'[the impracticability of joinder] is best seen by noting the difficulties involved in having thirty-five intervenors, all with their respective attorneys, attempt to go through the formal motions required for entrance into and participation in the suit.'" *Town of New Castle*, 131 F.R.D. 38, 41 (quotation omitted).  Here, the most likely alternatives to a class action, are either a complex joinder of the parties or the simultaneous adjudication of not only the 81 damage actions, but also over 4000 different injunctive actions across Florida, all or some of which could risk inconsistent adjudications. *See Bayshore Ford Truck Sales, Inc. v. Ford Motor Co*., 2006 U.S. Dist. LEXIS 64264 (D.N.J. Sept. 7, 2006).  Neither Defendant, nor its counsel has challenged numerosity of the proposed Rule 23 (b)(2) Class which includes 4,268 members. *See* Exhibit G hereto, Response to Interrogatory Nos. 3 and 5.

## VI.   CLASS TREATMENT IS SUPERIOR AND MANAGEABLE

### a.  Individual Suits and Monetary Incentives Do Not Preclude Superiority

Defendant also portrays as black letter law that if putative Class Members have potential financial incentives to pursue this litigation individually because of potentially large individual damage amounts or the potential attorney fee recovery,[16] then class treatment is *per se* not superior. DE 65 at 31-32.   However, "that individual class members have a financial incentive to pursue individual claims…is only one factor among many that the courts consider" in determining superiority.  *In re Recoton Corp. Secs. Litig*., 248 F.R.D. 606, 618 (M.D. Fla. 2006); *Chakejian v. Equifax Info. Servs. LLC*, 256 F.R.D. 492, 501 (E.D. Pa. 2009)(finding attorney's fees to litigants "indicative that a class action is by no means the 'only' feasible route for litigants…[however]…it remains the superior mechanism…where meaningful enforcement through individual litigation is unlikely").

---

[16]     Defendant incorrectly cites *Colomar v. Mercy Hosp., Inc*., 242 F.R.D. 671, 682 (S.D. Fla. 2007) for the proposition that the availability of attorney's fees under § 627.428 of the Florida Insurance Code destroys superiority. DE 65 at 40 n 61. The Court in *Colomar* did not cite this statute in its decision. Defendant also cites *Hammett v. Am. Bankers Ins. Co*., 203 F.R.D. 690, 701 (S.D. Fla. 2001), which is inapposite. DE 65 at 40 n 61.  That case did not revolve around a straightforward interpretation of a patent ambiguity. Instead in that case the "Defendants allegedly devised a scheme wherein claims were not processed on a timely basis, Defendants failed to pay amounts equal to the Insureds' finance charges plus the credit insurance premiums it automatically charged to the Insureds' accounts, and thereby created self terminating policies." *Id*. at 693.  A host of factors weighed against class certification in that case, not simply because the alleged RICO violation could have yielded treble damages and attorney's fees if successful. *Rutstein v. Avis Rent-A-Car Sys*., 211 F.3d 1228 (11th Cir. 2000) is another case Defendant cites to support its no "negative value," no class action argument. DE 65 at 40.  Far from being "directly on point" as Defendant maintains (given that the case was a civil rights suit and that the so-called "focus" of the case Defendant's allege appeared in a footnote [211 F.3d at 1241 n 21]), *Rutstein* is not controlling.  The footnote Defendant cites should be seen in the overall context of the footnote in which the Court observed "that [liability] issues involved in [that case] were predominantly case-specific in nature." *Id*.  That is not the situation here.

"[T]he predominance analysis . . . has a tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." *Klay v. Humana, Inc*., 382 F.3d 1241, 1269 (11th Cir. 2004).  "If a district court determines that issues common to all class members predominate over individual issues, then a class action will likely be more manageable than and superior to individual actions." *Williams*, --- F.3d ----, 2009 WL 1476702 (11th Cir. May 29, 2009). "[N]either the ability to independently bring suit nor the substantiality of the damage award binds this Court's superiority analysis." *Bayshore Ford Truck Sales, Inc. v. Ford Motor Co*., 2006 U.S. Dist. LEXIS 64264 (D.N.J. Sept. 7, 2006); 7 *Newberg on Class Actions* § 22:68 (4th ed.)(2009)("a predominance of larger claims does not militate against class actions"); *Id*. at § 4:39 (4th ed.)(2009)("the presence of large claims is not a ground for class denial"); *Id*. at § 18:40 (4th ed.)(2009)(same).  As the Supreme Court in *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997), upon which Defendant relies [DE 65 at 39], stated, "the text of 23(b)(3) does not exclude from certification cases in which individual damages run high …." *Accord In re Relafen Antitrust Litig*., 218 F.R.D. 337, 347 (D. Mass. 2003)(citing *Amchem* finding superiority even though damages may run high).

While it may true there could be a few Class Members with six-figure damages, this factor does not outweigh the advantages of having the Defendant's liability determined in one proceeding, especially since each member will have the opportunity to opt out. *See Klamberg v. Roth*, 473 F. Supp. 544, 559 (S.D.N.Y. 1979). Significant findings and "discovery required to prosecute the liability issues has already been accomplished in this forum." *Bayshore Ford Truck Sales, Inc. v. Ford Motor Co*., 2006 U.S. Dist. LEXIS 64264 (D.N.J. Sept. 7, 2006).  This Court is the only Court of which Plaintiffs are aware to have ruled with respect to the *Gradinger* decision from the Eleventh Circuit. Defendant has not sought to appeal this Court's decision based on *Grandinger*. The Court has already determined the Policy to be ambiguous as Plaintiffs have alleged.  It would make no sense for court after court to construe the same Policy provisions with the risk of inconsistent adjudications in this state. Defendant's most prolific sales agent is located in this District, which is where the litigation concerning the Policy has been entirely focused mostly by one of Plaintiffs' lawyers who is intimately familiar with Defendant's operations and the issues involved in the Policy's interpretation. *See* DE 69 at ¶¶ 19, 21, 23-30 and corresponding exhibits; *see In re Scientific-Atlanta, Inc. Secs. Litig*., 571 F. Supp. 2d 1315, 1344 (N.D. Ga. 2007)(noting location of witnesses and business in district as supporting superiority). In this litigation: (1) the insurance Policy forms with the nearly identical

relevant Policy language including Certificate Schedules have been located and introduced in the Court file; (2) Plaintiffs have established that the Policies typically contained the Certificate Schedules containing standardized terms, including the phrase "AUTOMATIC BENEFIT INCREASE PERCENTAGE Benefits increase by 8% each year" below the phrases for Maximum Lifetime and Per Occurrence Benefit Amounts [DE 58-3 at 16, Responses to Requests Nos. 23-24; Exhibit H hereto, Responses to Request Nos. 27, 29]; (3) Defendant did not apply the 8 % annual benefit to the Per Occurrence and Lifetime Maximum benefits [DE 58 at 7 n 22]; and, (4) Defendant has identified all of the Policyholders who have potential damage claims and who currently have a Policy in force who may be entitled to injunctive relief.[17]

Also, the fact that three members of the Classes have sought to intervene in this case (through counsel from another state nonetheless) rather than file separate individual lawsuits, shows that any interest individual members may have in controlling the prosecution or defense of their rights in separate actions given that this putative class case is already on file is lacking. *See Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*, 2006 U.S. Dist. LEXIS 64264 (D.N.J. Sept. 7, 2006).  Moreover, perhaps most importantly, absent a Class action, there is a very real prospect that no Class Members will ever receive notice concerning the judicial interpretations of their rights and have vindication of those rights under Defendant's Policy, even though Defendant has settled several cases on the same issue and two courts have determined the Policy to be defective. *See Hicks v. Client Servs.*, 257 F.R.D. 699 (S.D. Fla. 2009)(finding superiority even though actual damages and attorney's fees available by law, because Court should "not assume that class members understand the provisions well enough to know that it may be financially worthwhile to spend the time and effort to litigate these matters").

Class actions are meant to promote "economies of time, effort and expense." *Fabricant v. Sears Roebuck & Co.*, 202 F.R.D. 310, 318 (S.D. Fla. 2001).  It is not disputed that Defendant has never amended its Policy to correct the defective language in it.  It is not disputed that Defendant has never provided insureds notice of the various actions and judicial interpretations regarding its Policy's defective language. It is not disputed that Class Members are very elderly, and Defendant has already admitted that several have passed away. DE 86 at ¶¶ 5-6.  Their passing, however, was without having their rights vindicated under the Policy.  If certified as a class action, this case would bring the litigation on this Policy to a resolution more quickly and efficiently, rather than letting separate suits unfold incrementally over time while potential Class Members expire.  This factor alone outweighs the

---

[17] Superiority of class treatment, of course, is not a prerequisite to an injunctive relief class under Rule 23 (b)(2).

theoretical availability of significant damage awards and/or the availability of attorney's fees, which are not the black-letter maxims Defendant espouses.

### b.  Class Treatment is Manageable

Defendant states: "Trial in this case [of a Rule 23(b)(3) class] would be a *Franken*-trial, unmanageable at every level." DE 65 at 35.  Yet, at the same time, Defendant maintains that the Rule 23(b)(3) Class at 36 members is too small to warrant class treatment. *See* 3 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 9:53 (4th ed.)(2006)(observing that class members' having to prove damages individually only becomes a management problem when the class is large)(footnotes omitted). Controlling law in the Eleventh Circuit holds that any differences in damages among the members of a putative class, disagreements about damage distributions, or the fact damages will require individualized determinations is not enough to preclude its certification. *In re Scientific-Atlanta, Inc. Secs. Litig.*, 571 F. Supp. 2d 1315, 1342 (N.D. Ga. 2007)(citing *Allapattah Servs. v. Exxon Corp.,* 333 F.3d 1248, 1261 (11th Cir. 2003) and collecting numerous other cases); *Walco Investments, Inc. v. Thenen*, 168 F.R.D. 315, 330 (S.D. Fla. 1996).  This is so even if damages are not subject to a common formula.  *See  In re Scientific-Atlanta, Inc. Secs. Litig,* 571 F. Supp. 2d at 1343 (citing *Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)).

The relatively modest size of the Rule 23(b)(3) Class, the progress of the case and the nature of the claims Plaintiffs allege reveal a Rule 23(3) damage class is manageable.  "[T]he prevailing and preferable view is that a class action is properly certified and is superior to alternative available methods for adjudicating the controversy, though a detailed plan for adjudicating the remaining individual issues has not been devised or suggested at the time of the class certification." 3 *Newberg on Class Actions* § 9:61 (4th ed.)(2009). Nevertheless, Plaintiffs propose the following Exemplar Trial Management Plan ("Plan")[18] based on the authorities they have cited and progress of the case thus far to reply to Defendant's assertions about unmanageability and its specific reference to such a plan in the case:

This Plan is presented to demonstrate to the Court that this putative class action is manageable. However, because merits discovery is not complete and the case is not fully developed for trial, this Plan is preliminary and simply serves as an exemplar of how this case may be managed as a class action.

---

[18]     A trial plan "often assists in identifying the relationship between individual and common elements of proof" under Rule 23. MANUAL FOR COMPLEX LITIGATION FOURTH § 21.141.

In sum, Plaintiffs propose bifurcation between liability and damages[19] depending on the outcomes and determinations through the merits discovery phase of the case and after the Court rules upon class certification and notice is provided to the Class.[20]   Bifurcating liability and damage adjudications is a well-established procedure which Plaintiffs propose could work as a trial plan considering the following:

- Predominant Facts Going to Liability Are Common: The Policy, the material language at issue, Defendant's construction of that language and treatment of Class Members based on that language are common questions going to liability for all Class Members. As stated above, these common facts have mostly been determined or can easily be determined to resolve any disputed facts going to liability because they arise from the materially similar language of the Policy and Defendant's own records. *See Meyer v. CUNA Mut. Group*, 2006 U.S. Dist. LEXIS 4478 (W.D. Pa. Jan. 25, 2006); *Steinberg v. Nationwide Mutual Insurance Co.*, 224 F.R.D. 67 (E.D.N.Y. 2004).

- Liability Can Be Summarily Ruled Upon by the Court: Florida courts and Federal courts in Florida hold that the construction and effect of a written contract of insurance, including the determination and resolution of any ambiguity, is a matter of law to be decided by the Court, and can be decided by summary judgment without a jury trial. *Lumbermens Mut. Cas. Co. v. Dadeland Cove Section One Homeowners' Ass'n*, 2007 U.S. Dist. LEXIS 78319 (S.D. Fla. Oct. 11, 2007); *State Farm Fire and Casualty Company v. Castillo*, 829 So.2d 242, 244 (Fla. 3d D.C.A. 2002); *United Services Automobile Ass'n. v. Porras*, 214 So.2d 749(Fla. 3d DCA 1968).

Plaintiffs, therefore, propose a summary judgment proceeding in which the Court determines liability under the Policy. The Court's finding on liability would be the prerequisite for injunctive

---

[19]    "The judge can bifurcate (or for that matter trifurcate, or slice even more finely) a case at whatever point will minimize the overlap in evidence between the segmented phases or otherwise promote economy and accuracy in adjudication." *Hydrite Chem. Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 891 (7th Cir. 1995)(citation omitted). *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)(citation omitted)(noting option of bifurcating class action trials); *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 700 (N.D. Ga. 2003)(bifurcated class action proceeding).

[20]    "Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. Those solutions include (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)(citation omitted). "Bifurcation and severance under Rule 42 are available as tools that might make a case more manageable by separating out discrete issues for a phased or sequenced decision by the judge or at trial. In making such decisions, the judge must decide whether certification of issues classes, bifurcation, or severance is fair and workable ways to achieve class certification." MANUAL FOR COMPLEX LITIGATION FOURTH § 21.141; *see In re Bendectin Litig.*, 857 F.2d 290 (6th Cir. 1988) (upholding constitutionality of aggregate phase I trial on common issues of generic causation); *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468 (5th Cir. 1986) (dividing trial into phases dealing with common and individual issues separately); *see also Simon v. Philip Morris, Inc.*, 200 F.R.D. 21 (E.D.N.Y. 2001)(discussing severance and consolidation of issues for phased trials in class action); *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 628 (5th Cir. La. 1999); *See generally 3 Newberg on Class Actions* § 9:66 (4th ed.)(2009).

relief, which a court issues as a matter of law, and/or the prerequisite for damage determinations.  Of course, if the Court finds no liability on the part of Defendant, then the case is over as to injunctive relief and damage Classes.  This type of summary trial plan was accepted by the court in *Meyer v. CUNA Mut. Group*, 2006 U.S. Dist. LEXIS 4478 (W.D. Pa. Jan. 25, 2006), which is instructive.  The summary judgment order finding liability for breach of contract in favor of the CUNA plaintiff and class members based on an ambiguous insurance policy term and rules of policy interpretation is attached hereto as Exhibit I.

If a Rule 23(b)(2) class is certified and if a finding of liability is made in Plaintiffs' favor, Plaintiffs propose notice be provided to the Rule 23(b)(2) Class which notifies them of the Court's liability finding, the injunctive relief requested by Plaintiffs and the date for a hearing on a permanent injunction to determine whether or not Defendant will be ordered to apply the 8 % annual benefit increase to the Per Occurrence and Lifetime Maximum Benefits under the Policy on a prospective basis for the benefit of Rule 23(b)(2) Class Members.  If the Court certifies a Rule 23(b)(3) Class, they will be entitled to notice and opt out rights. 5-23 *Moore's Federal Practice* - Civil § 23.101 (notice and opt out rights mandatory for Rule 23(b)(3) classes).  In both instances, Defendant must assist Plaintiffs in locating and identifying Class Members for notice purposes.

- <u>Damage Adjudications</u>: Defendant has identified the damage Class Members and possesses claims files for those Class Members.  Assuming a damage class is certified, notice is sent, opt outs are processed and a summary judgment determination of liability is made in Plaintiffs and the Rule 23(b)(3) Class' favor, is it during the damage claims phase of class litigation that A general discussion of the "Methods for resolving irreducible individual issues" in class actions is addressed in 3 *Newberg on Class Actions* §§ 9:63 and 9:64 (4th ed.)(2009).   These are among the options available to the Court:

  o <u>Decertification of the Class</u>: Once liability is determined in favor of a Rule 23(b)(3) Class, the Court may decertify that Class with notice (to the non-opt out Class Members remaining) of such fact and the Class Members' rights to pursue individual damage litigation against Defendant. *See* n. 20, *supra*.  Plaintiffs do propose this, but it is the Court's option.

  o <u>Pre-Trial Summary Proceeding Before a Magistrate or Special Master</u>: It must be decided whether an aggregate damage model is appropriate along the lines Defendant

has suggested in other litigation on the Policy,[21] or whether more individualized proofs of out-of-pocket expenses will be required.  The exact number and identity of Rule 23 (b)(3) Class Members must also be decided.

Plaintiffs have submitted tentative disclosures of their damage calculations based on both models. DE 69-7 at 3; DE 69-8 at 3.   Defendant is currently in possession of the information it had at the time the Policy benefits were wrongly terminated, including signed reports from the Class Members' physicians [DE 58-10 at 5-17] called "plans of care" which are the documents which trigger payment of benefits under the Policy. DE 58-10; DE 58-6.  Defendant possesses records of on the identities and locations of likely damage Class Members and has their claims files.  After notice and opt-out rights have been afforded and a favorable summary judgment on liability to the Class, Plaintiffs propose discovery into the damages of non-opt-out Class Members regarding the exact identity, status and amount of damages of Class Members (who may number as few as 36-81 policyholders). After such discovery, Plaintiffs propose submitting arguments and evidence to a special master or the magistrate (if the Court does not wish to be initially involved) as to the proper measure of damages for each Class Member and the sufficiency of the facts underlying their damage claims. *See Fabricant v. Sears Roebuck & Co*., 202 F.R.D. 310, 313 (S.D. Fla. 2001).  The special master or magistrate will hear arguments and evidence on and issue a report to the Court stating his/her findings and identifying issues of material disputed facts to be decided by a jury, if any.  A plan of care, claims forms with agreed upon interrogatories, and other evidence may be required of each Class Member. Defendant may introduce its affirmative defenses and set-off arguments as to damages at this point. *See Allapattah Servs. v. Exxon Corp*., 333 F.3d 1248, 1259-1260 (11th Cir.  2003).[22]  The Court will review the report and rule accordingly. *See* 3 *Newberg on Class Actions* § 9:66 (4th ed.)(2009). If no material facts are in dispute and the Court awards damages, the special

---

[21]        In *Firstenberg v. Washington National Insurance Company*, Case No. 1:09-cv- 21098-UU (S.D. Fl.), Defendant argued that the out-of-pocket damages under the Policy were a simple mathematical calculation based on $180 per day times the number of days since the termination of benefits, and more if you apply the 8% benefits increase as provided for in the policy. *Id*., Notice of Removal (DE 1) at ¶¶ 14-17.

[22]        Plaintiffs cite the *Allapattah* line of decisions as a procedural example, but do not cite that line of cases as representative of the substantive insurance policy claims in this case . *Allapattah* decisions as to substantive law were guided by the UCC, not Florida insurance law and the Florida parol evidence rule as applied by Florida courts to patent ambiguities. *See Allapattah Servs. v. Exxon Corp*., 61 F. Supp. 2d 1308, 1314 n 7 (S.D. Fla. 1999).

master or magistrate will oversee the distribution of damages within the Parties' agreed procedures and/or those ordered by the Court, and the Court will enter final judgment.

o   Jury Verdict: If material facts are in dispute with respect to Class Members' damages, a jury trial may be held on the amount and method of damage calculation using special verdict forms. *See* 3 *Newberg on Class Actions* § 9:68 (4th ed.)(2009).   A similar procedure was employed in *Allapattah v. Exxon*, Case No. 91-0986 CIV-Gold/Simonton (S.D. Fl).   *See Allapattah* Docket Entry 1464 attached hereto as Exhibit J.   Significantly, *Allapattah* was handled as a class damage case which had roughly 10,000 members scattered over several states, as opposed to this single state case with as few as 36-81 members.

o   Final Judgment: The Court will enter final judgment based on the jury determination of damages.   If the jury awards Class Members damages and depending on the nature of the award, Plaintiffs propose that the Court enter a final judgment ordering distribution of damages to Class including a report to be received by Defendant on said distribution.

## VII.   PLAINTIFFS AND THEIR COUNSEL ARE ADEQUATE

Defendant's assertions about Plaintiffs and their counsel's inadequacy are also unavailing. Defendant, for example, is incorrect that attorneys in fact always lack class action standing. DE 65 at 35 (citing *Kleopa v Prudential Investment Mgt., Inc*., 2009 WL 2242606   (S.D. Fla. July 27, 2009). *Kleopa* and the cases that court relied upon found that attorneys in fact lacked standing when they attempt to bring suit in their own capacity, bringing suit in their own right, in other words, rather than as a representative. *Id*. at n 5.   This is not the situation here.   Both Attorneys in Fact are nominal Plaintiffs authorized to bring suit on behalf of their parents as agents and assignees.[23] DE 58-8 at 5-12; DE 58-7 at 5-11; §709.08, *Fla. Stat*. (durable powers of attorney to be followed as set forth in instrument creating attorney status); *Luria v. Devonshire Nat'l*, 2008 WL 1745063 (S.D.Fla.)(finding "grantee of the power of attorney is not suing in her own name but is suing in the name of the injured party, then the real party in interest is the injured party, not the grantee of the power of attorney"); *Burch v. SLM Corp*., 2008 U.S. Dist. LEXIS 55423 (S.D.N.Y. July 23, 2008)(allowing attorney in fact to be class representative). The practical effect of Defendant's position would be that no attorney in

---

[23] DE 58-8 at 5 indicates that Ms. Schwartz may act on her own independently contrary to what Defendant maintains about her joint status. *See* §709.08, *Fla. Stat*., stating that durable powers of attorney may provide for independent action when multiple attorneys are appointed.

fact could ever serve as a class representative for an incapacitated or elderly person,[24] leaving such persons without class-action standing entirely.

Furthermore, Defendant's premises about adequacy are misplaced. "Courts have repeatedly acknowledged that, especially in complex litigation, the named plaintiffs are unlikely to 'demonstrate mastery of the intricacies of the facts' of their action and rely on their attorneys to be strategists on their behalf.'" 5 *Newberg on Class Actions* § 15:30 (4th ed.)(2009). When a class representative has claims that "are identical to those of the class members…she therefore has no conflicting interests with the class." *Hicks v. Client Servs*., 2008 U.S. Dist. LEXIS 101129 * 23 (S.D. Fla. Dec. 10, 2008).  Class representatives are "inadequate only when their knowledge [i]s so insufficient that they would not be able or willing to protect the class's interests." *Id*. at *24 (citation omitted).  In this case, both Attorneys in Fact submitted declarations stating their willingness to pursue this litigation vigorously and that they have participated extensively. DE 58-7; DE 58-8. *See Hicks* (acknowledging such affidavits in weighing adequacy). The claims they bring on behalf of Plaintiffs (their parents) are the same as other Class Members. Ms. Ruderman is currently paying premiums, even though she has been cut off from benefits.[25] The Attorneys in Fact reviewed the pleadings before they were filed and were aware of mediation. Schwartz Dep. [DE 69-17], 22:13-16, 24:7, 41:1, 42:3, 45:4-6; Powers Dep. [DE 69-18], 72:3; Exhibit K hereto (errata sheet for Powers Dep.).  The Attorneys in Fact understood that this case was about the ambiguity in the Certificate Schedule and the rest of the Policy with respect to application of the 8 % annual benefit increases to the Lifetime and Per Occurrence Benefits. Schwartz Dep., 16:7, 12, 15-16, 19; 17:24-25; 18:1, 6; 70:20-23; Powers Dep., 74:20-25; 82:4-11.  They also understood their duties as class representatives and what damages were at issue. Schwartz Dep., 100:16, 24; 101:2, 6-11, 17; 104:4-6; 106:17-19; 107:2-4; Powers Dep., 100:8; 101:19-22. They are adequate.

Defendant finds suspect any reference to the age or situations of the insureds, or the dilemmas Defendant's wait-and-see approach to its Policy defect entails.   Instead, Defendant peppers its Response with *ad hominem* attacks.[26] There is simply nothing in the record to support any personal

---

[24] DE 69-17 is the Deposition of Bonnie Schwartz ("Schwartz Dep.").  She testifies her mother, Plaintiff Sydelle Ruderman, suffers from dementia and is unable to be deposed. *Id*. at 78:17-21; 89:2. DE 69-18 is the Deposition of Leslie Powers ("Power's Dep."). He likewise testifies his mother, Sylvia Powers, has dementia and could not be deposed.  *Id*. at 62:5-6; 65:21-17, 24-25.
[25] *See* Exhibit N hereto.
[26]       Defendant has gone to extraordinary lengths to disparage Plaintiffs in this case going so far as to claim they "flat-out lied to the court" [DE 65 at 21], "plaintiffs have sought to mislead the court," [DE 65 at 22], and Plaintiffs' "contrived, false and misleading sympathy play" [DE 65 at 23], regarding the impact on them of Defendant's breach of contract. The notion that Plaintiffs are exaggerating their plight is completely unfounded.

attacks on the Attorneys in Fact or Plaintiffs' lawyers in this case. Plaintiffs' counsel are highly qualified and Defendant has not offered any evidence to the contrary. They are more than adequate counsel for the proposed Classes.[27]

### VIII.   Rule 23(b)(2) Certification is Appropriate

Ultimately, one of the most glaring deficiencies in Defendant's Response is that it relegates any discussion of Rule 23(b)(2) certification standards to one or two lines and a single brief footnote, DE 65 at 27; 29 n 37. Defendant has focused on trying (unsuccessfully) to defeat predominance and manageability which are not Rule 23(b)(2) standards, despite that the Rule 23(b)(2) Class contains

---

*First,* prior to being cut-off, Plaintiffs were receiving care over a substantial period of time for various infirmities including dementia. They were both receiving full-time care consisting of two-twelve hour shifts. At no time were the plans of care or the split shifts questioned by Defendant. The cost of split shifts is substantially higher than a live-in. That is why when the benefits were suspended: Plaintiffs had to reduce the care to a live-in. This resulted in a substantial reduction in care because a live-in sleeps through the night, whereas with twelve hour shifts, the caregivers remain awake. Defendant is aware of this distinction; that is Defendant's business. *Second,* the notion that Plaintiff's lied about their funds rapidly depleting is absurd. They are both expending approximately $1,000 per week for care. It speaks for itself. *Third,* Defendant argues that Plaintiffs have somehow lied about the plaintiffs' immediate need for care and that the problem is widespread. Regarding the immediate need for care, every putative Class Member by definition is in need of immediate care because their benefits were suspended for having reached either their Per Occurrence or Lifetime Maximum benefits, and not because they were miraculously cured. Regarding the "widespread" nature of the problem, it is respectfully submitted that if a single insured is receiving less care than they require or for which they are entitled to reimbursement under the Policy, then that should be "widespread" enough, although by admission, there are scores of people affected by Defendant's refusal to properly administer policies. *Finally,* the sad truth is that Plaintiffs are in their 90's, need substantial care for infirmities that are well documented, are receiving substantially less care than they need, and are paying a lot of money for the care because Defendant refuses to honor covered claims. Equally sad is that at this stage of their lives, they have to be maligned by the company they paid premiums to for over 15 years for no other reason than they are pursuing a legally valid claim for covered benefits under Defendants insurance Policy.

[27]      The fault Defendant finds with Plaintiffs' counsels' adequacy is ironic. Contrary to what Defendant maintains not all Class counsel have brought individual cases against Defendant based on the Policy. Only Steven Dunn has. However, Mr. Dunn's experience with this Policy and Defendant actually supports his adequacy here, rather than detracts from it. The individual actions Mr. Dunn has brought do not conflict with this case, but seek to vindicate the same right alleged here with respect to the Policy and the 8% annual increase. There is no conflict, therefore, which goes to the subject matter of this case. *See* Wright & Miller, *Federal Practice and Procedure: Civil* § 1768 (2009)(commenting that only conflict going to the subject matter of the case is relevant to adequacy). That (as Defendant suggests) the individual plaintiffs in other litigation may opt out is pure speculation. *Sheftelman v. Jones,* 667 F. Supp. 859, 870 (N.D. Ga. 1987)(finding conflict of interest to destroy adequacy must be more than merely speculative or hypothetical); *cf.* 5 *Newberg on Class Actions* § 15:25 (4th ed.)(commenting that even in the situation where counsel attempts to represent the class and opt outs, she should not be precluded from serving as counsel absent a showing of actual prejudice). If the Classes here are certified those individual cases may be consolidated with this action. Along these lines, Mr. Dunn has filed Notices of Related Actions in other cases with a view toward getting all of the cases consolidated before this Court. *See* Exhibit L hereto. The Attorneys in Fact are aware that individual suits have been filed. Because Mr. Dunn has filed notices of the related cases, the individuals he represents are likewise advised of this case. If the Classes are not certified, then precious time will have been lost for the individual families he represents in the individual cases.

In fact, Defendant and another insured recently settled the case of *Greene v. Washington National,* a case arising out of the same Policy and issues as in the instant case. *See* Exhibit M hereto. To ensure transparency, as a condition of settlement, it was specifically agreed that the *Greene* case could be used in this litigation and any other case involving the subject Policy. Moreover, the result in *Greene* is completely consistent with what Plaintiffs seek here, to wit: (1) application of the 8% benefit increase rider to the Per Occurrence and Lifetime Maximum benefits ("any future benefit claims paid by WNIC under Janet Greene's home health care policy and on her behalf will not be subject to a per occurrence maximum or lifetime maximum limitation, and as such Mrs. Greene will be entitled to receive home health care benefits for the rest of her life." *Greene* release at 2; (2) reimbursement/payment for care expenses incurred from the date of cut-off ; and (3) payment of attorney fees and costs.

27

over 4000 members.  Defendant states nothing to rebut the fact that in failing to apply the 8% annual benefit to all Policy benefits "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief . . . with respect to the class as a whole."  Plaintiff's Rule 23(b)(2) Class should be certified.

Respectfully submitted,

ROTHSTEIN ROSENFELDT ADLER

By: s/ Steven R. Jaffe
STEVEN R. JAFFE  FLBN 390770
MARK S. FISTOS    FLBN 909191
SETH LEHRMAN  FLBN 132896
401 East Las Olas Blvd., Suite 1650
Fort Lauderdale, Florida 33301
Telephone 954-522-3456
Facsimile 954-527-8663

Steven M. Dunn, Esq.  FLBN 488534
STEVEN M. DUNN, P.A.
1135 Kane Concourse, 5th Floor
Bay Harbor Island, Florida  33154
Telephone  305-868-1400
Facsimile  305-868-1409

**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Court's CM/ECF system this 8th day of September 2009 and will be served on all counsel of record listed below through the ECF system.

Daniel J. Koleos, Esq.
KOLEOS, ROSENBERG & DOYLE, P.A.
8211 W. Broward Blvd., Suite PH4
Fort Lauderdale, FL 33324

Adam J. Kaiser, Esq.
Jeffrey J. Amato, Esq.
Paula C. Ro, Esq.
DEWEY & LeBOEUF, LLP
1301 Avenue of the Americas
New York, NY  10019-6092

By: s/ Steven R. Jaffe
STEVEN R. JAFFE